John J. Edmonds (State Bar No. 274200)
    jedmonds@ip-lit.com
EDMONDS & SCHLATHER, PLLC
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 973-7846
Facsimile: (213) 835-6996

Attorneys for Plaintiff,
Monument Peak Ventures, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONUMENT PEAK VENTURES, LLC<br><br>                      Plaintiff,<br><br>    v.<br><br>TOSHIBA AMERICA BUSINESS SOLUTIONS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC. AND TOSHIBA CORPORATION<br><br>                    Defendants. | CASE NO. 8:19-CV-2181<br><br>**COMPLAINT FOR INFRINGEMENT OF U.S. PATENT NOS. 6,903,762; 7,177,484; 7,583,294; 7,684,090; 8,665,345; 8,964,064 AND 9,549,095**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Monument Peak Ventures, LLC ("MPV") hereby submits its Complaint against Defendants Toshiba America Business Solutions, Inc., Toshiba America Information Systems, Inc., Toshiba America Electronic Components, Inc., and Toshiba Corporation, and alleges as follows:

## PARTIES

1.       Plaintiff MPV is a Texas limited liability company with its principal place of business in Plano, Texas.

2.       On information and belief, Defendant Toshiba America Business Solutions, Inc. ("TABS") is a California corporation with its principal place of business in Irvine, California.

3.     On information and belief, Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business in Irvine, California.

4.     On information and belief, Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business in Irvine, California.

5.     On information and belief, Toshiba Corporation ("Toshiba Corp.") is a Japanese corporation with its principal place of business in Tokyo, Japan.  Hereinafter, TABS, TAIS, TAEC and Toshiba Corp. are collectively referred to as "Toshiba" or Defendants.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over MPV's claims for patent infringement pursuant to the 28 U.S.C. §§ 1331 and 1338(a).

7.     Upon information and belief, this Court has personal jurisdiction over Defendants in this action because TABS, TAIS and TAEC are incorporated in this State and all Defendants have committed acts within this District giving rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants have committed acts of patent infringement and have regularly and systematically conducted and solicited business in this District by and through at least their sales and offers for sale of Defendants' products and/or services in this District and, on information and belief, their leases and/or ownership of office space in this District.

8.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b) at least because Defendants have committed acts of infringement in this District and have a regular and established place of business in this District. Further, Toshiba Corp. is a foreign corporation for which venue is proper at least under 28 U.S.C. § 1391(c)(3).

On information and belief, Defendants employ many people who work in their facilities in this District.

## NATURE OF THE ACTION

9.      This is a civil action for infringement under the patent laws of the United States, 35 U.S.C. § 271 et seq.

10.      MPV owns all right, title and interest in U.S. Patent Nos. 6,903,762; 7,177,484; 7,583,294; 7,684,090; 8,665,345; 8,964,064 and 9,549,095 (collectively the "Asserted Patents"), including all rights to sue and collect damages for past, present and future infringement thereof.

11.      MPV alleges that Toshiba directly and indirectly has infringed and continues to infringe the Asserted Patents by, *inter alia*, making, using, offering for sale, selling, importing, using (including in connection with internal uses and/or demonstrations) and/or inducing such actions, including in connection with providing the infringing products and instructions/specifications for their use. MPV seeks damages and other relief for Toshiba's infringement of the Asserted Patents.

12.      On or about June 20, 2018, MPV approached Toshiba and their affiliates to offer a license to MPV's Kodak portfolio. Since MPV acquired the Kodak portfolio it has successfully licensed multiple companies without resorting to litigation. Consistent with MPV's overall strategy to use litigation only as a last resort, MPV expressed on several occasions its desire to consummate a license with Toshiba outside of litigation.

13.      On or about June 20, 2018, MPV informed Toshiba of its infringement through a data room that included a full list of all patents owned by MPV and evidence of use presentations detailing Toshiba's infringement.

14.      Toshiba has had actual and/or constructive notice of the infringements alleged herein, including as noted above.

### The Asserted Patents Come From the Iconic Kodak Patent Portfolio

15.    The Asserted Patents claim inventions born from the ingenuity of the Eastman Kodak Company ("Kodak"), an iconic American imaging technology company that dates back to the late 1800s. The first model of a Kodak camera was released in 1888.

16.    In 1935 Kodak introduced "Kodachrome," a color reversal stock for movie and slide film. In 1963 Kodak introduced the Instamatic camera; an easy-to-load point-and-shoot camera.

17.    By 1976 Kodak was responsible for 90% of the photographic film and 85% of the cameras sold in the United States.

18.    At the peak of its domination of the camera industry, Kodak invented the first self-contained digital camera in 1975.

19.    By 1986 Kodak had created the first megapixel sensor that was capable of recording 1,400,000 pixels. While innovating in the digital imaging space Kodak developed an immense patent portfolio and extensively licensed its technology in the space. For example, in 2010, Kodak received $838,000,000 in patent licensing. As part of a reorganization of its business, Kodak sold many of its patents to some of the biggest names in technology that included Google, Facebook, Amazon, Microsoft, Samsung, Adobe Systems, HTC and others for $525,000,000.

20.    While scores of digital imaging companies have paid to license the Kodak patent portfolio owned by MPV, without justification Toshiba has refused to do so

### Count 1 – Infringement of U.S. Patent No. 6,903,762

21.    The application for U.S. Patent No. 6,903,762 (the "'762 patent) was filed on Dec. 13, 2000 and the patent issued on June 7, 2005.  The '762 patent also has priority as a continuation of U.S. Patent Application No. 09/549,356, filed on April14, 2000; and from Provisional U.S. Patent Application No. 60/137,078, filed on June 2,

1999.

22.   At the time of the '762 invention, the graphical user interfaces of digital cameras enabled many different features, including complex features, to be selected. This made the digital cameras complicated, and thus, difficult for users, especially first-time users, to use and understand.   Further, including due to this difficulty, the actual features of the digital camera normally remained the same for all users of the same model.

23.   The inventive features of '762 claimed inventions have multiple advantages over conventional prior art, including by providing methods for customizing a digital camera for at least two particular users by programming the programmable memory of the digital camera as claimed.   Such methods overcome the above shortcomings and other shortcomings of the art at the time.

24.   Conventional prior art is represented by the primary references cited during prosecution, which were U.S. Patent No. 6,006,039 to Steinberg *et al.* and U.S. Patent No. 5,541,656 to Kare *et al.*   However, the Examiner acknowledged that both Steinberg and Kare failed to disclose or suggest customization of a digital camera for at least two users.   Juxtaposing the '762 claimed inventions against the inferior, conventional state of the art represented by Steinberg and Kare illustrates in part the unconventionality and inventiveness of the '762 claimed inventions.

25.   Claim 19 of the '762 patent covers "method for customizing a digital camera for at least two particular users by programming the programmable memory of the digital camera which controls the operation of the digital camera, the method comprising the steps of: (a) displaying a list of selectable camera features that can be provided by the digital camera; (b) a first user selecting a first desired camera feature from the displayed list of camera features; (c) a second user selecting a second desired camera feature from the displayed list of camera features, wherein the second desired camera feature is different than the first desired camera feature; (d) programming the

programmable memory of the digital camera to enable the first desired camera feature and disable the second desired camera feature when the digital camera is used by the first user, and to enable the second desired camera feature and disable the first desired camera feature when the digital camera is used by the second user."

26.    At least claim 19 of the '762 patent is infringed by TABS and/or Toshiba Corp., including under 35 U.S.C. §271(a)-(b), by methods comprising the use of at least TABS's e-STUDIO2050C/2550C multi-function printers (the "'762 Infringing Instrumentalities").   Without limitation, sale, importation and/or use of the '762 Infringing Instrumentalities comprises and/or induces the steps noted below.

27.    To the extent the preamble is limiting, the '762 Infringing Instrumentalities comprise a method for customizing a digital camera for at least two particular users by programming the programmable memory of the digital camera which controls the operation of the digital camera, the method comprising the steps including those noted below.  Without limitation, *see, e.g.,* FC-2050C_TAG_EN_0009:





28.    The '762 Infringing Instrumentalities comprise displaying a list of selectable camera features that can be provided by the digital camera.   Without limitation, *see, e.g.,* FC-2050C_TAG_EN_0009:



and



29.     The '762 Infringing Instrumentalities comprise a first user selecting a first desired camera feature from the displayed list of camera features; and they further comprise a second user selecting a second desired camera feature from the displayed

list of camera features, wherein the second desired camera feature is different than the first desired camera feature,   Without limitation, a first user, for example with administrator privileges, may select a given role (*i.e.,* "a first desired camera feature") from the displayed list of roles. Similarly, a second user, for example with administrator privileges, may select another given role (*i.e.,* "a second desired camera feature") from the displayed list of roles. Each selected role has its own privileges and permitted options.  Without limitation, *see, e.g.,* FC-2050C_TAG_EN_0009:



and



30. The '762 Infringing Instrumentalities comprise programming the programmable memory of the digital camera to enable the first desired camera feature and disable the second desired camera feature when the digital camera is used by the first user, and to enable the second desired camera feature and disable the first desired camera feature when the digital camera is used by the second user. Without limitation, including based on the above selections, the scanner programs the memory to enable operations/functions permitted in the first role (*i.e.,* "first desired camera feature") and disable operations functions not permitted in the first role (*i.e.,* "second desired camera feature") when the scanner is used by the first user. Similarly, the scanner programs the memory in an analogous manner to enable operations/functions permitted in the second role (*i.e.,* "second desired camera feature") and disable operations functions not permitted in the second role (*i.e.,* "first desired camera feature") when the scanner is used by the second user. Without limitation, *see, e.g.,* FC-2050C_TAG_EN_0009:



31.     Defendants' acts of infringement of the '762 patent have been willful and intentional under the standard of *Halo*. Since at least April 2019, Defendants have willfully infringed the '762 patent by refusing to take a license and continuing the foregoing infringement, and further, since at least that date Defendants have actively induced the direct infringement of customers and/or end users, including by providing the '762 Infringing  Instrumentalities and instructions/specifications for their use, and including with the intent that such direct infringement occur.

32.     Defendants' acts of direct, indirect and willful infringement of the '762 patent have caused damage to MPV, and MPV is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**Count 2 – Infringement of U.S. Patent No. 7,177,484**

33.     The application for U.S. Patent No. 7,177,484 (the "'484 patent) was filed  on February 26, 2003, and the patent issued on February 13, 2007.

34.    At the time of the '484 invention, to obtain conventional imaging services and/or products, users typically went to a food/mass/drug retailer who offered such imaging service or products. It was the financial benefit of the retailer to sell as many imaging services or products as possible to the customer/user. Retailers displayed generic pictures or other advertising to entice a user to purchase imaging services or products. These pictures/ads may have had little or no interest to the user. In addition, clerks at retail locations were coached to ask users if they would like to try a new or existing imaging service or product. However, many users were unfamiliar with the offered services or are too busy to inquire. Further, many retailers use kiosks, rather than clerks, to take in orders for imaging services and/or products.

35.    The inventive features of '484 claimed inventions have multiple advantages over conventional prior art, including with respect to their inventive methods of creating and presenting customized digital images comprising promotional product digital images having modified user images disposed therewith.

36.    During prosecution, the primary reference cited was U.S. Patent No. 6,414,693 to Berger, *et al.*, which represents the conventional and inferior approaches at the time.  Far inferior from the '484 claimed inventions, Berger is directed to a method of customizing articles with user custom graphics. This is designed for use by companies wishing to promote their own company through a logo on a promotional item to be sold or given away, the

promotional item acting as an advertisement for the company. The method requires creation of a graphic artwork by the company or supplier, selection by the customer from among a database of supplier scaled images, and customer drag-and-drop placement of the selected artwork on a representation of the promotional item.  Berger does not disclose or suggest at least a predetermined image location, including because Berger provides a large area of the item on which the artwork can be placed, as opposed to the strict placement over which the user has no control in Applicants' claimed

invention. Further, Berger does not disclose or suggest modifying at least a portion of the user-supplied image to simulate application of the image to the actual promotional product. Berger applies the artwork image as is, as indicated from the drag-and-drop placement and visualization scheme, and therefore does not provide a realistic representation of the artwork on the promotional item. Including for these reasons, the conventional Berger patent did not disclose or suggest at least the inventive steps of providing a digital image representative of a promotional product having a predetermined image location adapted to receive at least a portion of the user-supplied digital image, generating a modified user image by modifying the at least a portion of the user-supplied digital image to simulate an application of the at least a portion of the user-supplied image to the promotional product, or generating a customized digital image representative of the customized promotional product having the modified user image disposed within the predetermined image location. Juxtaposing the '484 claimed inventions against the inferior, conventional state of the art represented by Berger, illustrates in part the unconventionality and inventiveness of the '484 claimed inventions.

37.     Claim 1 of the '484 patent covers a "method of offering a customized promotional product to a user, the method comprising the steps of: accessing a user-supplied digital image at a digital imaging device; providing a digital image representative of a promotional product, the promotional product digital image having a predetermined image location adapted to receive at least a portion of the user-supplied digital image; generating a modified user image by modifying the at least a portion of the user-supplied digital image to simulate an application of the at least a portion of the user-supplied image to the promotional product; generating a customized digital image representative of the customized promotional product, the customized digital image comprising the promotional product digital image having the modified user image disposed within the predetermined image location; and displaying the

customized digital image to the user on a display of the digital imaging device."

38.    At least claim 4 of the '484 patent is infringed by TABS and/or Toshiba Corp., including under 35 U.S.C. §271(a)-(b), by methods comprising the use of TABS's MoFoto applications and/or hardware implementing said applications (the "'484 Infringing Instrumentalities"). Without limitation, the sale and/or use of the '484 Infringing Instrumentalities comprises and/or induces the steps noted below.

39.    To the extent the preamble is limiting, the '484 Infringing Instrumentalities comprise a method of offering a customized promotional product to a user, the method comprising       the       steps       below.       Without       limitation,       *see,*       *e.g.,* http://tgcs04.toshibacommerce.com/cs/groups/internet/documents/document/b3mx/m jcw/~edisp/prod.tos1270895.pdf                                                     and http://brochure.copiercatalog.com/toshiba/Toshiba-Full-Line-Brochure-1.pdf:



40.    The '484 Infringing Instrumentalities comprise accessing a user-supplied digital image at a digital imaging device, for example a smartphone or tablet. Without limitation,                            *see,*                            *e.g.,* http://tgcs04.toshibacommerce.com/cs/groups/internet/documents/document/b3mx/m jcw/~edisp/prod.tos1270895.pdf             and             http://brochure.copiercatalog.com /toshiba/Toshiba-Full-Line-Brochure-1.pdf:

41.    The '484 Infringing Instrumentalities comprise providing a digital image representative of a promotional product, the promotional product digital image having a predetermined image location adapted to receive at least a portion of the user-supplied digital image. Without limitation, the '484 Infringing Instrumentalities comprise providing digital content of promotional figures and/or celebrities (including their accoutrements such as uniforms) having a predetermined location to receive the user-supplied image. Without limitation, *see, e.g.,* http://tgcs04.toshibacommerce.com/cs/groups/internet/documents/document/b3mx/mjcw/~edisp/prod.tos1270895.pdf:

You can layer digital content with the physical environment and the branded kiosk. The final result includes a lifelike, virtual image of customers together with their favorite sports figure, a celebrity, your company mascot or personality in a real world environment—as if he or she were actually there with them. The photo can then be shared through social media, bringing your brand to life.



42.    The '484 Infringing Instrumentalities comprise generating a modified user image by modifying the at least a portion of the user-supplied digital image to simulate an application of the at least a portion of the user-supplied image to the promotional product.  Without limitation, the '484 Infringing Instrumentalities generate a modified image by modifying at least a portion of the user-captured image to simulate that the user is actually with the figure, celebrity, etc. (*i.e.,* that simulate an application of at least a portion of the user-supplied image to the promotional product). Without limitation,       *see,          e.g.,*          http://tgcs04.toshibacommerce.com /cs/groups/internet/documents/document/b3mx/mjcw/~edisp/prod.tos1270895.pdf:



43.     Including   as   noted   immediately   above,   the   '484   Infringing Instrumentalities comprise generating a customized digital image representative of the customized  promotional  product,  the  customized  digital  image  comprising  the promotional product digital image having the modified user image disposed within the predetermined image location.

44.     The '484 Infringing Instrumentalities comprise displaying the customized digital image to the user on a display of the digital imaging device, for example the smart phone or tablet, including as noted above.

45.     Defendants' acts of infringement of the '484 patent have been willful and intentional  under  the  standard  of  *Halo*.  Since  at  least  April  2019,  Defendants  have willfully infringed the '484 patent by refusing to take a license and continuing the foregoing infringement, and further, since at least that date Defendants have actively induced the direct infringement of customers and/or end users, including by providing the '484 Infringing  Instrumentalities and instructions/specifications for their use, and

including with the intent that such direct infringement occur.

46.    Defendants' acts of direct, indirect and willful infringement of the '484 patent have caused damage to MPV, and MPV is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

## Count 3 – Infringement of U.S. Patent No. 7,583,294

47.    The application for U.S. Patent No. 7,583,294 (the "'294 patent) was filed on May 5, 2005, and the patent issued on September 1, 2009.  The '294 patent also has priority as a continuation of U.S. Patent Application No. No. 09/514,436, filed on February 28, 2000.

48.    At the time of the '294 invention, face detection was an area with impressive computational requirements, particularly if a robust face detection algorithm was needed. One challenge faced by the inventors was to implement face detection methods reasonably with limited memory resources, and with low computational cost.  Such an accomplishment can be a springboard to numerous other improvements in the image capture process. In addition, the improved facial detection of the invention downstream activities after image capture, *e.g.,* face detection could provide evidence of up/down orientation for subsequent printing (for example, of index prints).

49.    Claim 5 of the '294 patent covers a "method for determining the presence of a face from image data, said method comprising the steps of: (a) prescreening the image data with a first algorithm by using an algorithm interface adapter, the first algorithm determining a plurality of face candidates; and (b) operating on the face candidates with a second algorithm, the second algorithm processing the face candidates to determine the presence of the face; wherein the first algorithm has a first rate of false positives, and the second algorithm has a second rate of false positives lower than the first rate of false positives."

50.    The '294 claimed inventions comprise prescreening image data with a first

algorithm to determine a plurality of face candidates, and operating on the face candidates with a second algorithm to determine the presence of a face, wherein the second algorithm has a rate of false positives lower than the rate of false positives for the first algorithm.  An advantage of this combination is that the first algorithm can be designed to operate quickly, albeit with the potential for false positives, and the second component algorithm can restrict its more computationally intensive processing to the relatively few regions that have passed the first algorithm.  Further, knowledge of the presence and location of people in an image, and especially the presence and location of their faces, enables many beneficial improvements to be made in the image capture process. Another advantage is that data associated with the detection of faces in an image can be automatically recorded and included with or as an annotation of an image. This permits the automatic recording of significant subjects within a photographic record of events without requiring the annotation to be done by the photographer at the time of image acquisition or at a later time. The detection of faces in the scene then opens the way for significant additional enhancements to the image capture event and to subsequent processing of the image. For example, face detection provides a convenient means of indexing images for later retrieval, for example by fetching images containing one or more people as subjects. Consequently, running the face detection algorithm provides face data corresponding to one or more parameters such as location, orientation, scale and pose of one or more of the detected faces. In addition, once faces have been detected, a face recognition algorithm can be applied to identify faces from a gallery.

51.    Conventional prior art is represented by the primary reference cited during prosecution, which was U.S. Patent No. 6,263,113 to Abdel-Mottaleb, *et al.*  However, the Examiner acknowledged that Abdel-Mottaleb failed to disclose first and second rates of false positives, the second rate being lower than the first as claimed. Juxtaposing the '294 claimed inventions against the inferior, conventional state of the

art represented by Abdel-Mottaleb illustrates in part the unconventionality and inventiveness of the '294 claimed inventions.

52.     Claim 5 of the '294 patent covers a "method for determining the presence of a face from image data, said method comprising the steps of: (a) prescreening the image data with a first algorithm by using an algorithm interface adapter, the first algorithm determining a plurality of face candidates; and (b) operating on the face candidates with a second algorithm, the second algorithm processing the face candidates to determine the presence of the face; wherein the first algorithm has a first rate of false positives, and the second algorithm has a second rate of false positives lower than the first rate of false positives."

53.     At least claim 5 of the '294 patent is infringed by TAEC and/or Toshiba Corp., including under 35 U.S.C. §271(a)-(b), by methods comprising the use of TAEC's Visconti family (*e.g.,* Visconti, Visconti2 and related series, *e.g.,* the TMPV760 Series) of image recognition processors, including within camera-based systems   (the '294 Infringing Instrumentalities"). Without limitation, the sale, importation and/or use of the '294 Infringing Instrumentalities comprises and/or induces the steps noted below.

54.     To the extent the preamble is limiting, the '294 Infringing Instrumentalities comprise a method for determining the presence of a face from image data, said method comprising the steps noted below. See, *e.g.,* TMPV760 Series Image Recognition Processor Technical Datasheet, rev. 1.3.0, available at https://toshiba.semicon-storage.com/ap-en/product/assp/detail.TMPV7608XBG.html:

**Preface**

The TMPV760 Series are image recognition processors that process input video images in real-time. They detect target objects such as persons, faces, hands, vehicles, traffic lanes, and so on. The series can be used for camera vision systems utilizing various image-recognition technologies such as the Advanced Driver Assistance System (ADAS), the Intelligent Transport System (ITS), surveillance cameras, gaming devices, and energy control systems for air conditioning and lighting, etc.

55.     The '294 Infringing Instrumentalities comprise prescreening the image

data with a first algorithm by using an algorithm interface adapter, the first algorithm determining a plurality of face candidates.  Without limitation, the '294 Infringing Instrumentalities' image recognition processors prescreen image data with a first algorithm to determine a plurality of face candidates, including using "search region extraction" to segment the input image into regions of non-overlapping homogenous color or texture.  Without limitation, *see. e.g.,* https://toshiba.semicon-storage.com/us/product/automotive/image-recognition/features.html:



This process includes, without limitation, utilizing co-occurrence histograms of oriented gradients, including, without limitation, in connection with, driver monitoring, region buffers and/or bounding boxes.

56.    Further, the '294 Infringing Instrumentalities' first algorithm finds a plurality of face candidates. Without limitation, see above and *see. e.g.,* http://www.mpsoc-forum.org/previous/2015/slides/9B-Takashi%20Miyamori.pdf and HC24.28.425-Visconti2-Uchiyama-Toshiba.pdf:



and



57. The '294 Infringing Instrumentalities comprise operating on the face candidates with a second algorithm, the second algorithm processing the face candidates to determine the presence of the face. Without limitation, *see, e.g.,* TMPV760 Series Image Recognition Processor Technical Datasheet, rev. 1.3.0, available at https://toshiba.semicon-storage.com/ap-n/product/assp/ detail.TMPV7608XBG.html and https://news.toshiba.com/press-release/corporate/ai-

contributes-cutting-car-accidents-toshibas-image-recognition-lsi:

(4) **HOG (Histograms of Oriented Gradients) Accelerator**
Calculation of HOG or Toshiba CoHOG (Co-occurrence Histograms of Oriented Gradients) features and likelihood score output by using LSVM (Linear Support Vector Machine) with templates for human recognition

(5) **Enhanced CoHOG Accelerator**
Determination whether a person or not is processed by the linear support vector machine based on the histogram of the feature amount using color information, in addition to luminance gradient orientation.

**A small chip that instantly processes massive amounts of image information and recognizes objects**

Toshiba's image recognition LSI does all this without relying on the massive processing power of a dedicated onboard computer. Instead, it is a highly capable, self-contained solution, equipped with a "visual dictionary," a rich storehouse of data that allows it to recognize that an object on the road is actually a pedestrian not a lamppost. This is done by comparing image data with characteristics stored in the dictionary.

58.     The '294 Infringing Instrumentalities comprise operating on the face candidates with a second algorithm, the second algorithm processing the face candidates to determine the presence of the face (see above); wherein the first algorithm has a first rate of false positives, and the second algorithm has a second rate of false positives lower than the first rate of false positives.  Without limitation, the algorithm used to identify regions which may contain a face (*e.g.,* face candidate windows) will have a higher rate of false positives than the second algorithm (*e.g.,* Linear Support Vector Machine), which operates on face candidate windows to output a likelihood score with templates for human (*i.e.,* face) recognition.   Without limitation*, see, e.g.,* TMPV760 Series Image Recognition Processor Technical Datasheet, rev. 1.3.0, available at https://toshiba.semicon-storage.com/ap-en/product/assp/detail.TMPV7608XBG.html:

(4) **HOG (Histograms of Oriented Gradients) Accelerator**
Calculation of HOG or Toshiba CoHOG (Co-occurrence Histograms of Oriented Gradients) features and likelihood score output by using LSVM (Linear Support Vector Machine) with templates for human recognition

(5) **Enhanced CoHOG Accelerator**
Determination whether a person or not is processed by the linear support vector machine based on the histogram of the feature amount using color information, in addition to luminance gradient orientation.

59.     Defendants' acts of infringement of the '294 patent have been willful and intentional under the standard of Halo. Since at least December 2018, Defendants have willfully infringed the '294 patent by refusing to take a license and continuing the foregoing infringement, and further, since at least that date Defendants have actively induced the direct infringement of customers and/or end users, including by providing the '294 Infringing Instrumentalities and instructions/specifications for their use, and including with the intent that such direct infringement occur.

60.     Defendants' acts of direct, indirect and willful infringement of the '294 patent have caused damage to MPV, and MPV is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

### Count 4 – Infringement of U.S. Patent No. 7,684,090

61.     The application for U.S. Patent No. 7,684,090 (the "'090 patent) was filed on December 20, 2005 and the patent issued on March 23, 2010.

62.     Conventional printer technology is described in the background portion of the '090 specification.  Without limitation, at the time of the '090 invention, traditionally, printers were arranged in a manner that has a printing path for a receiver media that is aligned in a parallel direction with user controls. This allowed users to conveniently load receiver media, remove printed images and access the controls while facing a common "front end" of the printer. Accordingly, most users attempted to arrange such printers on a storage surface so that the "front end" faces outwardly to confront a user. However, this arrangement could create problems when printers have a long axis leading to the "front end" because it can be difficult to store such printers on a relatively short width on conventional shelving units without extending the "front end" of the printer beyond the edge of the shelf. Further, storing such printers with the long axis arranged parallel to a length of the shelf makes it difficult to access and utilize user controls. To further complicate this situation, printer positioning could also be influenced by factors such as a need to arrange the printer in a way that permits easy

reloading of donor materials such as thermal ribbons, ink and toner as well as the need to provide adequate ventilation and cord/cable access. Thus, a user of a printer may have had little flexibility in the arrangement of a printer within a particular storage area causing the printer to be arranged in a position in from which it was difficult to access printer controls.

63.    A similar problem arose when printers were equipped with status indicators or an image display in that such indicators and/or image displays were also typically arranged to be viewed from the "front face' of the printer.  For example, a digital printer may have included an image display as part of a printer graphical user interface (GUI) to allow the user to select images to be printed and to perform other printer functions. However, such a display typically faced the front end only.

64.    Yet another problem of this type was created when a printer was a so-called "docking printer" that is designed to receive a display device Such as a cellular phone, digital camera, photo viewer, personal display device, handheld personal computer or like item in a docking station, cradle or like structure to allow cooperation between the printer and the docked display device. Typically, such docking printers were adapted to receive a display device that was loaded by a person standing at the "front end thus, for some printers, it could become more difficult to dock such display devices when the user could not stand facing the printer. This reduced the frequency with which the devices were docked thus reducing the effective usefulness of the combination.

65.    What is needed in the art included the need for a printer that could provide more flexibility and customization of orientation without sacrificing its feature set. The '090 inventions provided inventive apparatuses for addressing this need and other needs, and for addressing these and other shortcomings of the conventional prior art.

66.    Claim 1 of the '090 patent covers a "printer for use with a display device having images stored in a memory therein, a display device controller, and an image

display for displaying the stored images, the printer comprising: an external structure housing a print engine and receiver medium transport adapted to cooperate to cause donor materials to be transferred to a receiver medium in an image wise fashion; a display device interface, said display device interface being adapted to receive the display device and to position the display device so that a display device electrical connector can form an electrical connection with the electrical interface to provide an electrical connection between the printer and the display device; and, a printer processor adapted to transmit signals to the display device controller influencing what is presented on the image display; wherein the display device interface is adjustably mounted to the external structure, with the display device interface being movable between a range of positions relative to the external structure of the printer while maintaining the electrical connection between the printer and the display device, so that the image display can be positioned at more than one position relative to the external structure of the printer while in a connected relationship with the printer."

67.    At least claim 1 of the '090 patent is infringed by TABS and/or Toshiba Corp., including under 35 U.S.C. §271(a)-(b), by methods comprising the use of at least multifunction printers comprising TABS's e-STUDIO907/1057/1207 multifunction printers (the "'090 Infringing Instrumentalities").  Without limitation, sale, importation and/or use of the '090 Infringing Instrumentalities comprises and/or induces the steps noted below.

68.    To the extent the preamble is limiting, the '090 Infringing Instrumentalities comprise a printer for use with a display device having images stored in a memory therein, a display device controller, and an image display for displaying the stored images, the printer comprising the elements noted below.

69.    The '090 Infringing Instrumentalities comprise an external structure housing a print engine and receiver medium transport adapted to cooperate to cause

donor materials to be transferred to a receiver medium in an image wise fashion. Without limitation, the printer includes an external structure housing a print engine and a receiver medium transport (*e.g.,* document feeder) to cause paper to be transferred to a receiver medium for print operations. Without limitation, *see, e.g.,* https://tbs.toshiba.com/media/downloads/products/1207%20Series%20Brochure.pdf:



and



and



70.    The '090 Infringing Instrumentalities comprise a display device interface, said display device interface being adapted to receive the display device and to position the display device so that a display device electrical connector can form an electrical connection with the electrical interface to provide an electrical connection between the printer and the display device. Without limitation, *see,* *e.g.,* https://tbs.toshiba.com/media/downloads/products/1207%20Series%20Brochure.pdf:



and

| Main Specifications | |
|---|---|
| e-STUDIO907/1057/1207 | Base Models Include LCD, 250-Sheet DSPF, 3,000-Sheet Paper Capacity (Two Tandem 2,000-Sheet Trays/Two 500-Sheet Trays), 1-TB Hard Disk Drive, PCL6/Adobe® Postscript® 3™ Network Printing, Color Network Scanning, And Retractable Keyboard |
| Type | Console, Monochrome Multi-Function Digital Document System |
| Display | 10.1" (Diagonally Measured) Color Dot Matrix High-Resolution Touch Panel Tilting Display 1024 x 600 Dots (W-SVGA) |
| Functions | Copy, Print, Network Print, Network Scan, And Document Filing |
| Cpu | Up t.o 1.8 GHz Multi-Processor Controller |
| Interface | RJ-45 Ethernet (10/100/1,000 Base-T), USB 2.0 (2 Host Ports, Front and Rear), USB 2.0 (1 Device Port) |
| Memory | Standard 5 GB |
| Hard Disk Drive | 1 TB |

71.    The '090 Infringing Instrumentalities comprise a printer processor adapted to transmit signals to the display device controller influencing what is presented on the image display. Without limitation, *see,* *e.g.,*

https://tbs.toshiba.com/media/downloads/products/1207%20Series%20Brochure.pdf

and http://business.toshiba.com/downloads/KB/f1Ulds/13073/contents/01-009.htm:



and



and



72.     The '090 Infringing Instrumentalities comprise a printer processor adapted to transmit signals to the display device controller influencing what is presented on the image display (see above), wherein the display device interface is adjustably mounted to the external structure, with the display device interface being movable between a range of positions relative to the external structure of the printer while maintaining the electrical connection between the printer and the display device, so that the image display can be positioned at more than one position relative to the external structure of the printer while in a connected relationship with the printer. Without limitation, *see, e.g.,* http://business.toshiba.com /downloads/KB/f1Ulds/13073/contents/01-009.htm:





73.     Defendants' acts of infringement of the '090 patent have been willful and intentional under the standard of *Halo*. Since at least July 2018, Defendants have willfully infringed the '090 patent by refusing to take a license and continuing the foregoing infringement, and further, since at least that date Defendants have actively induced the direct infringement of customers and/or end users, including by providing the '090 Infringing Instrumentalities and instructions/specifications for their use, and including with the intent that such direct infringement occur.

74.     Defendants' acts of direct, indirect and willful infringement of the '090 patent have caused damage to MPV, and MPV is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

### Count 5 – Infringement of U.S. Patent No. 8,665,345

75.     The application for U.S. Patent No. 8,665,345 (the "'345 patent) was filed on May 18, 2011, and the patent issued on March 2, 2014.

76.     At the time of the '345 invention, managing digital video content could be a difficult task. Videos were often represented visually with a thumbnail image of the first frame of the video. This may not provide much insight into the content of the video. Determining if a specific event is contained in a given video often required viewing the entire video. For a lengthy video, users would prefer a quick summary without having to view the video in its entirety.  Digital videos could also present

practical problems from a sharing perspective, because, even when compressed, the amount of data generated could make it impractical to share even relatively short videos.

77.    At the time of the '345 invention, video editing software could be used to manually summarize a video into a shorter version that can be shared more easily. However, manual video editing could be a lengthy, laborious process, and many users are not interested in manual editing. Automatic video summarization algorithms also existed, but they were very complex, as it was necessary to decode the video to perform the analysis required to determine the video summary. Thus, it was not possible on a digital capture device to immediately view a video summary corresponding to a just-captured video. This shortcoming in particular made it difficult to facilitate quick review and sharing of captured videos.

78.    Further, when creating a video summary, it is often desirable to have a specific feature within the summary. The video summary is created to contain some or all of the video content in which a feature is present. Examples of such features can include people, pets, events, locations, activities or objects. However, at the time of the '345 invention, manually creating such a tailored video summary can be a tedious process.

79.    It was thus desirable to provide systems and methods for computing a video summary. In particular, it was desirable to provide solutions that allow a video summary to be generated with minimal delay at the completion of video capture, including by use of the inventive claimed systems and methods.

80.    During prosecution of the '345 patent, the primary prior art reference, and the benchmark for conventional prior art, was U.S. Published Patent Application No. 2011/0085778 to Iwase, *et al.*  However, the Patent Examiner acknowledged that Iwase did not disclose "reference data separate from a reference in the captured video sequence" that is used to "form a video summary ... containing the feature of interest."

Further, even the cited combination of Iwase and U.S. Published Patent Application No. 2010/0104146 to Momosaki did not disclose, among other things, reference data including information specifying a "desired characteristic" of the image frames or a video summary including fewer than all of the image frames in the captured video sequence, wherein the video summary includes at least part of the identified subset of image frames containing the feature of interest and having the "desired characteristic." Juxtaposing the '345 claimed inventions against the inferior, conventional state of the art represented by Iwase and Momosaki, illustrates in part the unconventionality and inventiveness of the '345 claimed inventions.

81.    The inventive features of '345 claimed inventions have multiple inventive advantages over conventional prior art, including with respect to overcoming the shortcomings noted above.

82.    Claim 16 of the '345 patent covers a "method comprising: receiving a video sequence including a time sequence of image frames; specifying reference data separate from a reference in the received video sequence, wherein the reference data indicates a feature of interest, and wherein the reference data includes information specifying a desired characteristic of the image frames; using a data processor to automatically analyze the image frames using a feature recognition algorithm to identify a subset of the image frames that contain the feature of interest and have the desired characteristic; forming a video summary including fewer than all of the image frames in the video sequence, wherein the video summary includes at least part of the identified subset of image frames containing the feature of interest and having the desired characteristic; and storing a representation of the video summary in a processor-accessible storage memory."

83.    At least claim 16 of the '345 patent is infringed by TAIS and/or Toshiba Corp., including under 35 U.S.C. §271(a)-(b), by methods comprising the use of the TAIS Symbio smart home solution (the "'345 Infringing Instrumentalities"). Without

limitation, sale, importation and/or use of the '345 Infringing Instrumentalities comprises and/or induces the steps noted below.  Without limitation, *see, e.g.*: http://toshiba-smarthome.com/          and          http://news.toshiba.com/press-release/corporate/toshiba-america-inc-introduces-symbio-smart-home-solution.http://news.toshiba.com/press-release/corporate/toshiba-america-inc-introduces-symbio-smart-home-solution.

84.   To the extent the preamble is limiting, the '345 Infringing Instrumentalities comprise receiving a video sequence including a time sequence of image frames. Without          limitation,     *see,     e.g.*:     http://toshiba-smarthome.com/          and http://news.toshiba.com/press-release/corporate/toshiba-america-inc-introduces-symbio-smart-home-solution.http://news.toshiba.com/press-release/corporate/toshiba-america-inc-introduces-symbio-smart-home-solution     and http://toshiba-smarthome.com/downloads/Symbio_D11_User_Guide.pdf:

## TOSHIBA AMERICA, INC. INTRODUCES THE SYMBIO™ SMART HOME SOLUTION

*Offers Six Smart Home Functions in One Easy-to-Use Device*

**Category:**
Corporate, Lifestyle Products and Services
Tuesday, January 2, 2018 9:58 am EST
**Dateline:**
IRVINE, CA

Toshiba America Visual Solutions Division has announced the U.S. release of the new Symbio™ multi-function smart home solution, delivering the capabilities of six products—a wireless security camera, smart speaker, voice control with Amazon® Alexa, an intercom, smart sound detector and an expandable smart home hub—all in a single elegant device.

and

## Six smart home functions in one.

Who could guess that a simple, sleek design could be packed with so much functionality? Symbio™ is the world's first IoT solution to incorporate six capabilities into one device:



**Security Camera**

Keep an eye on your home environment.



**Smart Speaker**

Enjoy your favorite music, news, ebooks and more.

**Voice Control with Amazon® Alexa**

Ask questions. Control music and smart home devices. Get reminders, and more.

**Smart Sound Detector**

Listen in on what matters most, plus get alerts from legacy smoke detectors.



**Intercom**

Communicate to Symbio™ from anywhere.

 

**Smart Home Hub**

Add new smart home functions—as many as you like. Control everything with a single app.

and



9. **Live Video button**

Tap to display the **Live Video Screen** screen. This is where you can view the real-time image Symbio is monitoring.

⇒ Live Video Screen

85.   The '345 Infringing Instrumentalities comprise specifying reference data separate from a reference in the received video sequence, wherein the reference data indicates a feature of interest, and wherein the reference data includes information specifying a desired characteristic of the image frames.  Without limitation, the '345 Infringing Instrumentalities specify reference data specifying a feature of interest, said reference data includes information specifying a desired characteristic of the image frames, and it separate from a reference in the received video sequence. Without limitation,             *see,*             *e.g.*             http://toshiba-smarthome.com/downloads/Symbio_D11_User_Guide.pdf:

7. **Camera**

Tap to perform following operations.

- Change the camera resolution

- Specify the area for motion detection

- Specify the time length for one-touch recording

- Change the sensitivity and area for motion detection. Symbio detects motion by calculating the percentage of pixels changed in a designated window. You can change the window in which Symbio will look for motion and how sensitive it should be to trigger a motion detection.

86.    The '345 Infringing Instrumentalities comprise using a data processor to automatically analyze the image frames using a feature recognition algorithm to identify a subset of the image frames that contain the feature of interest and have the desired characteristic. Without limitation, *see, e.g.* http://news.toshiba.com/press-release/corporate/toshiba-america-inc-introduces-symbio-smart-home-solution    and http://toshiba-smarthome.com/downloads/Symbio_D11_User_Guide.pdf:

Six smart home Symbio™ functions:

1. Security Camera: 1080p Full HD, wide-angle, low-light camera keeps an eye on children, pets and the home environment for greater peace of mind. Provides sound- and motion-based alerts, and streams live HD video to a smartphone.
2. Smart Sound Detector: Monitors for loud sounds, including legacy smoke detectors, and sends smartphone alerts for increased safety.
3. Smart Speaker: Integrated full range speaker offers built-in access to Bluetooth® or almost limitless streaming music from leading services like Amazon Music, Pandora® and iHeart Radio®. Features an exclusive ODMD (Onkyo Double Molding Diaphragm) high-excursion driver to deliver rich, immersive sound.
4. Touch-free Voice Control with Amazon® Alexa: With simple voice commands, Alexa can answer questions, play music, provide news updates and control lights, temperature and more.
5. Smart Home Hub: Allows your Symbio™ to connect and control additional sensors and devices. Easily expand your system over time with a variety of third-party IoT devices.
6. Intercom: Offers built-in microphones and speaker to enable two-way communication between Symbio™ and your smartphones.

and

**7. Camera**

Tap to perform following operations.

- Change the camera resolution

- Specify the area for motion detection

- Specify the time length for one-touch recording

- Change the sensitivity and area for motion detection. Symbio detects motion by calculating the percentage of pixels changed in a designated window. You can change the window in which Symbio will look for motion and how sensitive it should be to trigger a motion detection.

87.    The '345 Infringing Instrumentalities comprise forming a video summary including fewer than all of the image frames in the video sequence, wherein the video summary includes at least part of the identified subset of image frames containing the feature of interest and having the desired characteristic; and storing a representation of the video summary in a processor-accessible storage memory. Without limitation, *see, e.g.* http://toshiba-smarthome.com/features.html:



88.    Defendants' acts of infringement of the '345 patent have been willful and intentional under the standard of Halo. Since at least July 2018, Defendants have willfully infringed the '345 patent by refusing to take a license and continuing the foregoing infringement, and further, since at least that date Defendants have actively induced the direct infringement of customers and/or end users, including by providing

the '345 Infringing Instrumentalities and instructions/specifications for their use, and including with the intent that such direct infringement occur.

89.    Defendants' acts of direct, indirect and willful infringement of the '345 patent have caused damage to MPV, and MPV is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

### Count 6 – Infringement of U.S. Patent No. 8,964,064

90.    The application for U.S. Patent No. 8,964,064 (the "'064 patent) was filed on April 11, 2014 and the patent issued on February 24, 2015.   The '064 patent also has priority as a continuation of U.S. Patent Application No. 12/642,275, filed on Dec. 18, 2009; and from Provisional U.S. Patent Application No. 61/138,729, filed on December 18, 2008.

91.    At the time of the '064 invention, users of digital image capture devices were likely to be unaware whether particular images have already been transferred from the camera to remote storage. This made it difficult to know whether images could be deleted, including to free up space for more images, and made it more difficult to use the image capture device.  Further, users faced difficulty when a camera's internal memory filled up. The inventive features of '064 claimed inventions helped solve these and other problems and shortcomings with conventional art at the time.

92.    Claim 8 of the '064 patent covers "system comprising: an image capture device including a memory, a user interface, and a processing system, wherein the processing system is configured to: store captured images in the memory of the image capture device; allow for the transfer of at least some of the stored images to a remote storage device; store, in the image capture device, data indicating which of the stored images have been transferred to the remote storage device; receive, from the user interface, an indication that all captured images that have been stored and previously transferred to the remote storage device are to be deleted; delete, from the memory, all captured images that have been stored and previously transferred to the remote storage

device in response to the receipt of the indication that all captured images that have been stored and previously transferred to the remote storage device are to be deleted."

93.    At least claim 8 of the '064 patent is infringed by TABS and/or Toshiba Corp., including under 35 U.S.C. §271(a)-(b), by systems comprising at least multifunctioning printers comprising TABS's 5008A multifunctioning printers (the "'064 Infringing Instrumentalities").  Without limitation, sale, importation and/or use of the '064 Infringing Instrumentalities comprises and/or induces the elements noted below.        Without        limitation,        *see,*        *e.g.*: http://brochure.copiercatalog.com/toshiba/Toshiba-Full-Line-Brochure-1.pdf.

94.    The '064 Infringing Instrumentalities comprise an image capture device including a memory, a user interface, and a processing system. Without limitation, the '064 Infringing Instrumentalities comprise a scanner (*i.e.,* "an image capture device") and include a memory for storing image acquisition data, a user interface for receiving operator commands, and a processing system for controlling image capture and post processing        operations.        Without        limitation,        *see,*        *e.g.* http://brochure.copiercatalog.com/toshiba/Toshiba-Full-Line-Brochure-1.pdf:



**TOSHIBA**        features at a glance:

> 35/45/50 PPM

> 2,400 x 1,200 DPI Resolution with Smoothing

> 320GB FIPS 140-2 Validated

> Self-Encrypting Drive (SED)

> Data Overwrite Standard

> 240 IPM Duplex Scan Speed, 300-sheet Dual-Scan Document Feeder

95.    The '064 Infringing Instrumentalities store image files (*i.e.,* "captured images") in their internal storage device (*i.e.,* "memory of the image capture device").

Without limitation, *see,* *e.g.* MFP Management Guide at http://business.toshiba.com/downloads/KB/f1Ulds/15805/eS5008A_UFG_EN_0004. pdf?_ga=2.177606117.1986403532.155551 4124-1864312562.1555092700:

**File**

You can automatically delete files stored by the Scan to File operation. Use this menu to set the maintenance function and periodically delete <u>files stored in the internal storage device</u> to secure its available space.

96.     The '064 Infringing Instrumentalities comprise a processing system (see above), wherein the processing system is configured to allow for sending (*i.e.,* "allow for transfer") of at least some stored image files to a network folder (*i.e.,* "remote storage device"). Without limitation, *see,* *e.g.* https://business.toshiba.com/downloads/KB/f1Ulds/9364/FC-2050C_SCG_EN_0008.pdf                                  and http://business.toshiba.com/downloads/KB/f1Ulds/15805/eS5008A_UFG_EN_0004. pdf?_ga=2.177606117.1986403532.155551 4124-1864312562.1555092700:



and

## File

You can automatically delete files stored by the Scan to File operation. Use this menu to set the maintenance function and periodically delete files stored in the internal storage device to secure its available space.

97.     The '064 Infringing Instrumentalities comprise a processing system (see above), wherein the processing system is configured to store, in the image capture device, data indicating which of the stored images have been transferred to the remote storage device. Without limitation, to enable periodic automatic deletion of image files stored internally and transferred to the network folder, for example, by the Scan to File operation, the '064 Infringing Instrumentalities store data indicating which of the image files have been stored and previously transferred to the network folder. Without limitation,            *see,*                *e.g.*            http://business.toshiba.com /downloads/KB/f1Ulds/14144/Scanning_EN_(EBN)_Ver01F.pdf:



98.     The '064 Infringing Instrumentalities comprise a processing system (see above), wherein the processing system is configured to receive, from the user interface, an indication that all captured images that have been stored and previously transferred to the remote storage device are to be deleted; and to delete, from the memory, all captured images that have been stored and previously transferred to the remote storage device in response to the receipt of the indication that all captured images that have

been stored and previously transferred to the remote storage device are to be deleted. Without limitation, *see, e.g.* MFP Management Guide at http://business.toshiba.com/downloads/KB/f1Ulds/15805/eS5008A_UFG_EN_0004. pdf?_ga=2.177606117.1986403532.155551  4124-1864312562.1555092700:

99.

**File**

You can automatically delete files stored by the Scan to File operation. Use this menu to set the maintenance function and periodically delete files stored in the internal storage device to secure its available space.

Tip

For instructions on how to display the Maintenance screen, see the following page:
P.35 "Accessing the Admin Menu"

| Item name | Description |
|-----------|-------------|
| On | Press this button to enable the storage maintenance. |
| Off | Press this button to disable the storage maintenance. |

100.   Defendants' acts of infringement of the '064 patent have been willful and intentional under the standard of *Halo*. Since at least April 2019, Defendants have willfully infringed the '064 patent by refusing to take a license and continuing the foregoing infringement, and further, since at least that date Defendants have actively induced the direct infringement of customers and/or end users, including by providing the '064 Infringing Instrumentalities and instructions/specifications for their use, and including with the intent that such direct infringement occur.

101.   Defendants' acts of direct, indirect and willful infringement of the '064 patent have caused damage to MPV, and MPV is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**Count 7 – Infringement of U.S. Patent No. 9,549,095**

102.   The application for U.S. Patent No. 9,549,095 (the "'095 patent) was filed on January 8, 2015, and the patent issued on January 17, 2017.  The '095 patent also has priority as a continuation of U.S. Patent Application No. 14/250,689, filed on Apr. 11, 2014, which is a continuation of U.S. Patent Application No. 12/642,275, filed on

December 18, 2009; and from Provisional U.S. Patent Application No. 61/138,729, filed on December 18, 2008.

103.   At the time of the '095 invention, users of digital image capture devices were likely to be unaware whether particular images have already been transferred from the camera to remote storage. This made it difficult to know whether images could be deleted, including to free up space for more images, and made it more difficult to use the image capture device.   Further, users faced difficulty when a camera's internal memory filled up. The inventive features of '064 claimed inventions helped solve these and other problems and shortcomings with conventional art at the time.

104.   Claim 9 of the '095 patent covers a "system comprising: an image capture device including a memory, a user interface, and a processing system, wherein the processing system is configured to: communicate at least one of a plurality of captured images in the memory of the image capture device to a remote storage device; store, in the image capture device, data indicating which of the plurality of captured images have been communicated to the remote storage device; and delete, from the memory, captured images that have been stored and previously transferred to the remote storage device in response to receiving an indication that captured images that have been stored and previously communicated to the remote storage device are to be deleted."

105.   At least claim 9 of the '095 patent is infringed by TABS and/or Toshiba Corp., including under 35 U.S.C. §271(a)-(b), by systems comprising at least multifunctioning printers comprising TABS's 5008A multifunctioning printers (the "'095 Infringing Instrumentalities").   Without limitation, sale, importation and/or use of the '095 Infringing Instrumentalities comprises and/or induces the elements noted below.   Without limitation, use of the '095 Infringing Instrumentalities comprises the steps noted below.

106.   The '095 Infringing Instrumentalities comprise an image capture device including a memory, a user interface, and a processing system. Without limitation, the

'064 Infringing Instrumentalities comprise a scanner (*i.e.,* "an image capture device") and include a memory for storing image acquisition data, a user interface for receiving operator commands, and a processing system for controlling image capture and post processing operations. Without limitation*, see, e.g.* http://brochure.copiercatalog.com/toshiba/Toshiba-Full-Line-Brochure-1.pdf:



**features at a glance:**

> 35/45/50 PPM

> 2,400 x 1,200 DPI Resolution with Smoothing

> 320GB FIPS 140-2 Validated

> Self-Encrypting Drive (SED)

> Data Overwrite Standard

> 240 IPM Duplex Scan Speed, 300-sheet Dual-Scan Document Feeder

107.   The '095 Infringing Instrumentalities comprise an image capture device including a processing system (see above), wherein the processing system is configured to communicate at least one of a plurality of captured images in the memory of the image capture device to a remote storage device. Without limitation, the '095 Infringing Instrumentalities send (*i.e.,* "communicate") at least some stored image files (*i.e.,* "captured images") to a network folder (*i.e.,* "remote storage device"). Without limitation*, see, e.g.* https://business.toshiba.com/downloads/KB/f1Ulds/9364/FC-2050C_SCG_EN_ 0008.pdf:



108.   The '095 Infringing Instrumentalities comprise an image capture device including a processing system (see above), wherein the processing system is configured to store, in the image capture device, data indicating which of the plurality of captured images have been communicated to the remote storage device. Without limitation, to enable periodic automatic deletion of image files stored internally and transferred to the network folder, for example, by the Scan to File operation, the '095 Infringing Instrumentalities store data indicating which of the  image files have been stored and previously transferred to the network folder. Without limitation, *see, e.g.* http://business.toshiba.com/

downloads/KB/f1Ulds/14144/Scanning_EN_(EBN)_Ver01F.pdf:

**File**

You can automatically delete files stored by the Scan to File operation. Use this menu to set the maintenance function and periodically delete files stored in the internal storage device to secure its available space.

**2  Select a file destination.**

- **[MFP Local]** — Press this button to store files in a shared folder of this equipment.
- **[Remote 1]**, **[Remote 2]** — Press this button to store files in a network folder, which is the shared folder of a computer connected with this equipment by network.

109.   The '095 Infringing Instrumentalities comprise an image capture device including a processing system (see above), wherein the processing system is configured to delete, from the memory, captured images that have been stored and previously transferred to the remote storage device in response to receiving an indication that captured images that have been stored and previously communicated to the remote storage device are to be deleted.  Without limitation, the '095 Infringing Instrumentalities periodically delete from memory the image files that have been stored and previously  transferred to the network folder in response to receiving a button input (*i.e.,* "an indication") that image  files known to have been communicated to the network folder are to be deleted.  Without limitation*, see, e.g.* http://business.toshiba.com/downloads/KB/f1Ulds/15805/eS5008A_UFG_EN_0004. pdf?_ga=2.177606117.1986403532.155551  4124-1864312562.1555092700:

## File

You can automatically delete files stored by the Scan to File operation. Use this menu to set the maintenance function and periodically delete files stored in the internal storage device to secure its available space.

Tip

For instructions on how to display the Maintenance screen, see the following page:
📖 P.35 "Accessing the Admin Menu"

| Item name | Description |
|---|---|
| On | Press this button to enable the storage maintenance. |
| Off | Press this button to disable the storage maintenance. |

110.   Defendants' acts of infringement of the '095 patent have been willful and intentional under the standard of *Halo*. Since at least April 2019, Defendants have willfully infringed the ' 095 patent by refusing to take a license and continuing the foregoing infringement, and further, since at least that date Defendants have actively induced the direct infringement of customers and/or end users, including by providing the '095 Infringing Instrumentalities and instructions/specifications for their use, and including with the intent that such direct infringement occur.

111.   Defendants' acts of direct, indirect and willful infringement of the '095 patent have caused damage to MPV, and MPV is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff hereby respectfully requests that this Court enter judgment in favor of Plaintiff and against Toshiba, and that the Court grant Plaintiff the following relief:

A. An adjudication that one or more claims of the Patents-in-Suit has been directly and/or indirectly infringed by Toshiba;

B. An award to Plaintiff of damages adequate to compensate Plaintiff for Toshiba's past infringement, together with pre-judgment and post-judgment interest, and

any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses, and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C. A grant of preliminary and permanent injunction pursuant to 35 U.S.C. § 283, enjoining Toshiba and all persons, including its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation therewith, from making, using, offering to sell, or selling in the United States or importing into the United States any methods, systems, or computer readable media that directly or indirectly infringe any claim of the Patents-in-Suit, or any methods, systems, or computer readable media that are colorably different;

D. That this Court declare that Toshiba's infringement has been, and continues to be, willful, including that Toshiba acted to infringe the Patents-in-Suit despite an objectively high likelihood that its actions constituted infringement of a valid patent and, accordingly, award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284;

E. That this Court declare this to be an exceptional case and award Plaintiff reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

F. A judgment and order requiring Toshiba to pay Plaintiff its damages, costs, expenses, fees, and prejudgment and post-judgment interest for Toshiba's infringement of the Patents-in-Suit as provided under 35 U.S.C. §§ 284 and/or 285; and

G. Any and all further relief for which Plaintiff may show itself justly entitled that this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby respectfully requests a trial by jury of any issues so triable by right.

Dated: November 11, 2019                EDMONDS & SCHLATHER, PLLC

                                        */S/ John J. Edmonds*
                                        John J. Edmonds
                                        State Bar No. 274200

                                        *Attorneys for Plaintiff,*
                                        MONUMENT PEAK VENTURES, LLC